ORIGINAL

FILED
JUL 15 2008
U.S. COURT OF FEDERAL CLAIMS

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| MIDTOWN DEVELOPMENT, L.L.C., Plaintiff, | ) | |
| vs. | ) | **Civil Action No.** 08-514 C |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**COMPLAINT**

Plaintiff Midtown Development, L.L.C. ("Midtown"), for its Complaint against defendant United States of America (the "United States" or "Government"), alleges as follows:

## I. Summary of Action

1. This action constitutes Midtown's appeal of a Final Decision by a General Services Administration ("GSA") Contracting Officer (a) upholding the GSA's January 2007 improper determination to cancel Lease No. GS-06P-60003 (the "Lease") issued under Solicitation for Offers 5IA0023 (the "SFO") pursuant to which Midtown was to provide office space to house the Social Security Administration's ("SSA") Waterloo, Iowa District Office; and (b) improperly asserting against Midtown a claim for purported resolicitation costs.

2. As discussed in greater detail below, in order to serve the national interest in revitalizing the faltering downtown areas of cities around the country, federal policy dictates that Government agencies and departments, when making decisions concerning the locations of their offices, give preferential consideration to downtown locations and historic buildings. Contrary to this policy, when the SSA determined in or about 2005 to relocate its Waterloo District Office, both the SSA and the GSA, as the Government's contracting arm for securing

new SSA space, excluded Waterloo's downtown district from any consideration as a possible site for a new District Office. In complete derogation of the goals of the policy, a Government representative involved in the procurement proclaimed to Midtown that downtown areas were too old and had undesirable businesses.

3. Iowa Senator Tom Harkin and others interceded, and in November 2005 the GSA reversed course, at least facially, and announced it would consider leasing office space in Waterloo's historic downtown district.

4. Midtown owned and managed an office center in downtown Waterloo, which included, as its centerpiece, a 90-year-old, landmark building that for nearly 70 years was home to a storied Waterloo department store and which had undergone a multi-million dollar revitalization and conversion to office space. In November 2005, Midtown expressed to the GSA its interest in offering to lease space in this office center for the new SSA Waterloo District Office.

5. In December 2005, some four months before offers in response to the SFO were due, the GSA and SSA toured and examined the building and space that Midtown proposed to lease. As part of this review, the GSA and SSA, including the GSA Contracting Officer then in charge of the procurement, the GSA's Realty Specialist, and a Government engineer responsible for the procurement, were made fully aware of, and even measured, the spacing between and size of the structural concrete support columns located in the space to be occupied by the SSA. Even though certain of these dimensions were less than the optimal dimensions indicated in the SFO, the GSA and SSA representatives told Midtown the dimensions would not be a problem and that the Government could work with them just as it had in connection

with other projects. The GSA immediately thereafter informed Midtown in a letter dated December 22, 2005, that the property "was approved for the solicitation process."

6. Midtown timely submitted a proposal in response to the SFO. Repeating what had been made clear to the GSA and SSA during the site visit in December 2005, Midtown's offer identified the spacing and size of the columns in the space to be leased. Neither the GSA nor the SSA raised any issues concerning column size or spacing during the evaluation of Midtown's proposal or at any time thereafter prior to award of the Lease. On January 4, 2007, the GSA awarded the Lease to Midtown, and Midtown signed and returned to the GSA fully executed copies of the Lease documents on January 8, 2007.

7. Shortly thereafter, on January 26, 2007, the GSA informed Midtown that it was withdrawing the Lease on the basis of what it claimed was its recent "discover[y]" of purported discrepancies in the leased space regarding, primarily, column spacing and size. The GSA was unable to identify, however, anything about the column spacing or size in the leased space that it had not already been fully apprised and aware of prior to making the decision to award the Lease to Midtown.

8. As a result of the GSA's unjustified and improper cancellation of the Lease it had properly awarded to Midtown, which the GSA Contracting Officer upheld in a Final Decision dated July 17, 2007, Midtown has suffered significant damages, as described herein and as will be established in this action. In addition, there is no basis for any claim by the Government against Midtown for purported resolicitation costs.

## II. **The Parties**

9. Plaintiff Midtown is a corporation organized and existing under the laws of the State of Iowa with its principal place of business located in Waterloo, Iowa. Midtown's principals include Donna Nelson and Vern Nelson Sr.

10. Regarding the principal conduct complained of herein, the United States acted by and through the GSA. As described herein, the GSA acted as the contracting party for the Government in connection with obtaining a lease of office space to house an office of the SSA.

## III. Jurisdiction

11. This Court has jurisdiction over this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-13, and under 28 U.S.C. § 1491(a)(1) and (2). This action is being filed within one year of Midtown's receipt of the Contracting Officer's Final Decision.

## IV. Facts Common to All Counts

### A. Midtown and Its Principals

12. For nearly forty years, Midtown's principals, Vern Nelson Sr. and Donna Nelson, have been involved in commercial real estate development in and around Waterloo, Iowa. Their projects have included the revitalization, preservation, and management of properties in Waterloo's historic downtown district, as well as the development and management of other and newer properties located outside of the downtown district. Donna Nelson was the first President and is a founding member of the Waterloo Redevelopment Authority, now known as Main Street.

13. Midtown is a commercial real estate development and management firm owned by Nelson family members.

14. One of Midtown's properties in downtown Waterloo is known as the historic Black's Building. The original section of the Black's Building dates to 1914. For nearly 70 years, it housed Waterloo's storied Black's Department Store. After the store closed in 1981, the building and its annexes were revitalized in a multi-million dollar renovation project and now comprise a multi-use office center.

B. **<u>The Government's Determination To Relocate the Social Security Administration's Waterloo District Office</u>**

15. In order to serve the national interest in revitalizing the faltering downtown areas of cities around the country, federal policy dictates that Government agencies and departments, when making decisions concerning the locations of their offices, give preferential consideration to downtown locations and historic buildings.

16. The SSA maintains and operates a Waterloo, Iowa District Office serving the City of Waterloo and a number of surrounding Iowa counties.

17. On or about September 17, 2004, the District Manager of the SSA's Waterloo District Office, Mr. Jerry Nelson (no relation to the Nelson family who owns Midtown), spoke with Midtown representative Vern Nelson Jr. about obtaining space for a new SSA District Office. Vern Nelson Jr. arranged for Jerry Nelson to tour space in two separate buildings, the Black's Building owned by Midtown and the "River Plaza Building," which Vern Nelson Sr. and Donna Nelson owned personally. Jerry Nelson toured the two spaces with Vern Nelson Jr. on or about September 21, 2004.

18. Through the winter and spring of 2004/2005, the SSA, on information and belief, discussed internally the relocation of its Waterloo District Office and submitted a space request package to the GSA. On or about April 5, 2005, the SSA's Jerry Nelson informed Midtown principal Donna Nelson that the SSA would soon be seeking to lease space for a new District Office.

19. By the spring, summer, and early fall of 2005, the GSA had determined -- contrary to federal policy – to exclude from consideration for a potential lease properties located in downtown Waterloo. During this period, an SSA representative explained to Midtown

representatives that downtown areas were undesirable because, among other things, they are old and have undesirable businesses.

20. Iowa Senator Tom Harkin, among others, interceded on behalf of ensuring that downtown Waterloo was considered as a possible location for the SSA's new Waterloo District Office. By November 3, 2005, the GSA reversed itself, at least facially, and expanded the delineated area for a potential lease to include downtown Waterloo. The revised delineated area was advertised through a posting on FedBizOpps.gov on November 3, 2005.

### C. <u>Midtown's Expression of Interest Regarding the Black's Building and the GSA's Initial Approval of the Building</u>

21. On November 11, 2005, Midtown's Donna Nelson responded to the GSA's formal notice, with an expression of interest identifying both the Black's Building and the River Plaza Building as possible sites for the SSA's Waterloo District Office. Ms. Nelson requested that the GSA let her know when it wished to tour the proposed sites.

22. On or about December 1, 2005, the GSA issued the SFO, requesting offers for the lease of space to house the SSA's Waterloo District Office. The SFO contained a provision stating that "[p]reference will be given to Offerors of space in buildings in, or formally listed as eligible for inclusion in, the National Register of Historic Places, and to historically-significant buildings in historic districts listed in the National Register." The SFO also stated that "[i]t is within the discretion of the Contracting Officer to accept alternatives to certain architectural characteristics and safety features defined elsewhere in this SFO to maintain the historical integrity of the building, such as high ceilings, wooden floors, etc."

23. The SFO included a provision stating that, "[t]o demonstrate potential for efficient layout, the Offeror may be requested to provide a test fit layout at the Offeror's expense when the space offered contains certain features like . . . narrow column spacing; Column spacing

shall be no closer than 20-feet center to center and 20-feet from column center to wall. Columns shall be no more than two feet square."

24. On or about December 20, 2005, Midtown's representatives hosted representatives of the GSA and the SSA for a presentation on and tour of the Black's Building and the River Plaza Building. The Government representatives included GSA Realty Specialist Valerie Waldmeier; GSA Contracting Officer for the procurement Kristin Ritter; Chad Good, an engineer representing the Government; and Jerry Nelson of the SSA. Representatives of Midtown included Donna Nelson, Vern Nelson Sr., Vern Nelson Jr., Vern Nelson III, and Tammy Wieneck.

25. Ms. Wieneck made a formal presentation to the Government representatives and provided the Government representatives with, among other things, a booklet describing the Black's Building, floor plans drawn to scale showing the size of the columns and the spacing, and renderings of the building's façade. These renderings showed, among other things, balconies of luxury apartments that Midtown intended to build out in space two floors above the first-floor space being offered to the GSA. Information relating to the apartments was also published in the Waterloo Courier within the next month, and the GSA's Realty Specialist, Ms. Waldmeier, indicated to Midtown that Government officials had seen that article.

26. Immediately following the formal presentation on December 20, 2005, the Government representatives toured the Black's Building and the River Plaza Building to review the space proposed for the SSA's Waterloo District Office. The Government representatives asked various questions, including about the size and spacing of the columns in the Black's Building space. The Government representatives also took measurements of the spacing of the columns in the Black's Building. Vern Nelson Jr. and Chad Good additionally reviewed

column size and spacing on additional floors of the Black's Building. Mr. Good said that the spacing and size of the columns in the Black's Building space proposed for the SSA would not be a problem and that the Government could work with the columns and spacing just as it had done before in connection with other projects. Other Government officials present at this walk-through, including Contracting Officer Kristin Ritter, indicated their concurrence.

27. On or about December 21, 2005, Valerie Waldmeier of the GSA spoke by telephone with Vern Nelson Sr. and informed him that the Black's Building had been approved as a site that could be proposed in response to the upcoming lease solicitation. Ms. Waldmeier also told Mr. Nelson Sr. that the River Plaza Building had not been approved because it contained an atrium. Ms. Waldmeier confirmed the GSA's approval of the Black's Building in a letter to Midtown dated December 22, 2005, which stated that property had been "approved for the solicitation process."

D. **Midtown's Proposal**

28. On or about May 6, 2006, Midtown submitted to the GSA an offer in response to the SFO as revised. Midtown offered to lease to the GSA first-floor space within the Black's Building, which the GSA had previously approved for bidding.

29. On or about August 8, 2006, Valerie Waldmeier of the GSA called Midtown's Donna Nelson and advised that Midtown was among the lowest bidders.

30. Midtown timely submitted to the GSA all required documentation in response to the SFO by the date for Best and Final Offers, August 11, 2006.

E. **Midtown's Relocation of Tenants Within the Black's Building and Other Activities Prior to January 4, 2007**

31. At the time that Midtown submitted its offer to the GSA, the space Midtown was offering to the GSA for the SSA's use was occupied by two tenants, the Black Hawk County (Iowa) Democratic Central Committee and an Iowa Department of Human Services agency known as Employees Partnering in Child Support ("EPICS").

32. On or about July 1, 2006, after Midtown had submitted its offer to the GSA, EPICS advised Midtown that it desired to lease the entire first floor of the Black's Building, which included the space that Midtown had proposed to lease to the GSA. Midtown responded that it was seeking to lease the first-floor space to the GSA and that it could make available to EPICS space on the fifth floor of the Black's Building.

33. Because the GSA represented to Midtown that Midtown was a finalist and one of the lowest bidders, Midtown requested that EPICS move to the fifth floor. EPICS agreed that it would move to the fifth floor, provided Midtown paid for all additional costs necessitated by the move from the first to the fifth floor and that there be no disruption of telephone and data service to EPICS. Because of the GSA's representations, Midtown agreed to do so.

34. Between the GSA's August 11, 2006 telephone call to Midtown and January 4, 2007, the GSA worked with Midtown to insure that the premises Midtown offered were proper and that additional GSA requests were met. For example, the GSA requested security cameras, and Midtown and the City of Waterloo reached an agreement to bear the costs of this expense.

F. **The GSA's Award of the Lease to Midtown and Midtown's Preparation of the Space**

35. On or about January 4, 2007, the GSA informed Midtown orally and by letter that the GSA had accepted Midtown's offer.

36. On or about January 8, 2007, the GSA presented Midtown with the formal Lease for the space, and Midtown executed the Lease and returned two copies to the GSA.

37. As soon as the GSA informed Midtown of its selection, Midtown immediately commenced demolition work necessary to begin the process of converting the space in issue for SSA use. In addition to the work done to enable the EPICS move, the space was gutted, from floor to ceiling and from wall to wall. Among other things, a granite, glass, and steel staircase was removed and a replacement floor was installed where the staircase had carried through the floor above; electrical, HVAC, and plumbing fixtures were removed; floor coverings were removed; ceilings and light fixtures were removed; and columns were stripped to bare cement.

G. **The GSA's Termination of the Lease**

38. By letter dated January 26, 2007, the GSA Contracting Officer for the Lease abruptly informed Midtown that the GSA was withdrawing its acceptance of the Lease because of its purported discovery "[o]ver the past few weeks" of claimed discrepancies between the SFO's requirements and the Black's Building space it had leased from Midtown. The primary such discrepancy concerned the spacing of the columns and the size of certain of the columns.

39. Thereafter, the GSA and Midtown met and held discussions concerning the spacing and size of the columns. In the course of these discussions, Midtown requested that the GSA identify how any of the column measurements differed from what had been made clear to the GSA, dating as far back as December 20, 2005 when the GSA and SSA representatives viewed and measured the columns and proclaimed them acceptable, and continuing through Midtown's offer in response to the SFO. The GSA, however, could not identify any such differences.

40. By letters dated March 21, 2007 and April 4, 2007, the GSA informed Midtown that the GSA had concluded that the space Midtown had offered in response to the SFO was not acceptable to the Government.

**II. <u>Midtown's Appeal of the GSA's Withdrawal of the Lease</u>**

41. Midtown timely submitted to the GSA and then pursued a claim relating to the GSA's decision to withdraw the Lease. By letter dated June 15, 2007, the GSA acknowledged receipt of Midtown's claim.

42. On July 17, 2007, GSA Contracting Officer Shenika Kuchar issued a "Final Decision of the Contracting Officer" (the "Final Decision"), in which she denied Midtown's appeal in its entirety and asserted, without any supporting evidence or documentation, a claim against Midtown in the amount of $250,000, which she declared "represent[ed] the estimated cost of re-soliciting the instant procurement."

43. Midtown received a copy of the Final Decision on July 25, 2007.

**Count One**

44. The allegations contained in paragraphs 1 through 43 are incorporated by reference as though fully stated herein.

45. The GSA's cancellation and termination of the Lease into which it entered with Midtown in January 2007 was improper and constitutes a breach of the GSA's obligations under the Lease.

46. As a direct and proximate result of the GSA's breach of the Lease with Midtown, Midtown has suffered damages in an amount to be determined at trial.

47. The Government's failure to pay Midtown's claim has damaged Midtown in an amount to be determined at trial and constitutes a breach of contract and a violation of applicable laws and regulations.

**Count Two**

48. The allegations contained in paragraphs 1 through 43 and 45 through 47 are incorporated by reference as though fully set forth herein.

49. The GSA's actions prior to cancellation and termination of the Lease into which it entered with Midtown in January 2007 were improper and constitute a breach of the implied contract between the GSA and Midtown relating to Midtown's preparation and submission of an offer in response to the SFO, as well as the Government's consideration thereof, and the GSA's implied covenant in that contract to treat and deal with Midtown fairly and in good faith.

50. As a direct and proximate result of the GSA's breach of the covenant of good faith and fair dealing, Midtown has suffered damages in an amount to be determined at trial.

51. The Government's failure to pay Midtown's claim has damaged Midtown and constitutes a breach of the implied covenant of good faith and fair dealing and a violation of applicable laws and regulations.

**Count Three**

52. The allegations contained in paragraphs 1 through 43, 45 through 47, and 49 through 51 are incorporated by reference as though fully set forth herein.

53. No basis exists in law or in fact for the GSA's claim against Midtown in the Final Decision for $250,000 "representing the estimated cost of re-soliciting the instant procurement."

54. A justiciable controversy exists between the United States and Midtown concerning this claim, the interests of the United States and Midtown relating to this claim are adverse, Midtown has a legally protected interest in this controversy, and the matter is ripe for judicial determination. Midtown is entitled to declaratory relief proclaiming that the GSA's claim against Midtown for $250,000 is contrary to law and unenforceable, and that there is no

basis for any liability of Midtown to the Government relating to the SFO or Lease in issue in this action.

**Prayer for Relief**

WHEREFORE, Midtown prays

1. That judgment be entered in favor of Midtown in an amount to be determined at trial, including applicable interest, fees, and costs for attorneys and consultants;

2. That the Court enter a declaratory judgment proclaiming that the GSA's claim against Midtown for $250,000 is contrary to law and unenforceable, and that there is no basis for any liability of Midtown to the Government relating to the Lease in issue in this action; and

3. That Midtown be awarded such other relief as the Court deems proper.

MIDTOWN DEVELOPMENT, L.L.C.

Dated: July 15, 2008

Respectfully submitted,

Howard J. Stanislawski
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Counsel of Record for Plaintiff Midtown Development, L.L.C.

Of Counsel:

Dave Nagle
DAVE NAGLE LAW OFFICE
501 Sycamore Street, Suite 704
P.O. Box 792
Waterloo, Iowa 50704
319-234-3623

Max E. Kirk
BALL, KIRK & HOLM, P.C.
3324 Kimball Avenue
P.O. Box 2696
Waterloo, Iowa 50704
319-234-2638

Attorneys for Plaintiff Midtown Development, L.L.C.

Robert J. Conlan
Ileana Maria Ciobanu
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Attorneys for Plaintiff Midtown Development, L.L.C.